NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 07a0409n.06
Filed: June 19, 2007

No. 05-6473

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| Robert Drew, | ) | |
| | ) | ON APPEAL FROM THE |
| Petitioner-Appellant, | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE MIDDLE |
| v. | ) | DISTRICT OF TENNESSEE |
| | ) | |
| Tony Parker, Warden, | ) | **O P I N I O N** |
| | ) | |
| Respondent-Appellee. | ) | |

BEFORE:    CLAY, GILMAN, and McKEAGUE, Circuit Judges.

**McKeague, Circuit Judge.** Petitioner Robert Drew was convicted in Tennessee state court of theft of property valued at $1,000 or more, but under $10,000. After exhausting state court remedies, he filed a petition for a writ of habeas corpus in the United States District Court for the Middle District of Tennessee. The district court modified and adopted the report and recommendation of the magistrate judge to whom the case was referred; it thus granted Respondent Tony Parker's motion for summary judgment and dismissed the petition. On appeal, Petitioner argues that (1) the court below erred in not suppressing the identification evidence because the showup procedure was impermissibly suggestive and the identification was not independently reliable and (2) the trial court's flight instruction deprived Petitioner of his Fifth Amendment right against self-incrimination. We AFFIRM the decision of the district court.

## I. BACKGROUND

On June 16, 1995, Linda Capley was working at Lavert's Market in West Nashville. Earlier that day she had been in the liquor store attached to the market, and while in the liquor store, Petitioner came in, talked with her for a few minutes, and purchased a bottle of wine. Later in the day, she was waiting on a woman in the market, and Petitioner came in and stood behind the woman in line. She was cashing several checks and had just opened a new bundle of twenty-dollar bills, which contained $2,000, and had placed them in the register.

While waiting on a customer, Ms. Capley opened the cash register drawer, and Petitioner reached over the counter and took a handful of twenty-dollar bills out of the register. At that moment, Ms. Capley screamed, "He got my money," and she ran after him as he fled from the market. Mary Sigler, the owner of the market, was on the telephone when Petitioner came into the store. She did not see Petitioner take the money out of the register; however, she saw the money in his hand as he was drawing his hand back from the register. Two other men who worked near the market witnessed Petitioner running from the store with money in his hands and chased him to a nearby field that surrounded an abandoned grain silo.

Officer Jeff Burnette was dispatched to Lavert's Market after a call came in reporting the incident. He was instructed by an eyewitness who saw Petitioner run from the store with the money in his hands that he ran to the field near the grain silo. Ms. Capley described the perpetrator as a black male wearing a white-colored shirt and blue jeans. Ms. Sigler described the perpetrator as wearing a light-colored shirt and dark pants. She said that he had a very identifiable face with a long nose, long face, and normal size lips. She said that she could see

Petitioner very well in the market and that he had stood in line for at least a couple of minutes, which provided a good opportunity to look at him.

After searching the area near the silo for nearly two hours, Officer Burnette located Petitioner hiding near a grain bin. He was wearing a white shirt and dark pants, and he had $260 in twenty-dollar bills in his left front pocket. After arresting him, Officer Burnette returned to the market and asked each witness to walk by the police car and determine if they could identify the man in the car. Each witness individually identified Petitioner as the perpetrator.

Although Petitioner had only $260 in twenty-dollar bills in his possession when he was arrested, Mary Sigler testified that based on the amount of money that had been put in the register that day, roughly $2,000 was missing. Furthermore, Linda Capley testified that she had just put a bundle of twenty-dollar bills in the register, which contained $2,000. The only money that Petitioner took from the register was twenty-dollar bills.

Prior to trial, the defendant moved to suppress the showup identification as being impermissibly suggestive and as tainting any subsequent in-court identifications. Ms. Sigler, Ms. Capley, and Officer Jeff Burnette testified as to the events described above, and at the conclusion of the hearing, the trial judge, relying upon the case of *Neil v. Biggers*, 409 U.S. 188 (1972), denied Petitioner's motion to suppress the showup identification.

On August 18, 1998, a jury found Petitioner guilty of theft of property valued at $1,000 or more, but under $10,000. He was sentenced to twelve years in prison in the Tennessee Department of Corrections as a career offender. The Tennessee Court of Criminal Appeals affirmed his conviction on direct appeal, and the Tennessee Supreme Court denied his

application for further review. Petitioner then filed a petition for state post-conviction relief.

The trial court denied the petition, the Tennessee Court of Criminal Appeals affirmed that denial,

and the Tennessee Supreme Court again denied further review.

On January 19, 2005, Petitioner filed a petition for a writ of habeas corpus in the United

States District Court for the Middle District of Tennessee. In it, he raised four issues: (1) that he

was subjected to an overly suggestive identification procedure; (2) that there was insufficient

evidence to support his conviction; (3) that he was denied effective assistance of counsel; and (4)

that the trial judge erred in giving a flight instruction. Respondent Tony Parker, warden at West

Tennessee State Penitentiary, filed a motion for summary judgment. The magistrate judge

recommended that the district court grant Respondent's motion and dismiss the petition.

The district court adopted as modified the magistrate's report and recommendation,

dismissing the petition and granting summary judgment to Respondent. The district court also

denied Petitioner a certificate of appealability. We granted Petitioner's application for a

certificate of appealability as to the following issues: (1) whether Petitioner was subjected to an

overly suggestive identification procedure; (2) whether the evidence concerning the amount of

cash stolen was insufficient to support his conviction; (3) whether trial counsel rendered

ineffective assistance by failing to adequately investigate how much cash was taken; (4) whether

the trial court erroneously instructed the jury on flight; and (5) whether the district court failed to

review the entire state court record, necessitating remand. In the instant appeal, Petitioner raises

only the first and fourth issues.

## II. ANALYSIS

## A. Standard of Review

We apply a de novo standard of review to the district court's conclusions of law and a clearly erroneous standard of review to the district court's findings of fact. *Brown v. Palmer*, 441 F.3d 347, 350 (6th Cir. 2006) (citation omitted). The Antiterrorism and Effective Death Penalty Act of 1996 dictates the standard of review for state court determinations in habeas petitions. *Id.* According to the Supreme Court,

> Under [28 U.S.C.] § 2254(d)(1), the writ may issue only if one of the following two conditions is satisfied – the state-court adjudication resulted in a decision that (1) "was contrary to . . . clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "involved an unreasonable application of . . . clearly established Federal law, as determined by the Supreme Court of the United States." Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

*Williams v. Taylor*, 529 U.S. 362, 412-13 (2000).

The Court has further explained that "contrary to" should be construed to mean "'diametrically different,' 'opposite in character or nature,' or 'mutually opposed'" and that the proper inquiry for the "unreasonable application" analysis is whether the state court decision was "objectively unreasonable" and not simply erroneous or incorrect. *Williams*, 529 U.S. at 409-11. Finally, state court findings of fact are presumed correct, and the habeas applicant has the burden of rebutting that presumption by clear and convincing evidence. *Benge v. Johnson*, 474 F.3d 236, 241 (6th Cir. 2007) (quoting *McAdoo v. Elo*, 365 F.3d 487, 493-94 (6th Cir. 2004)).

**B. The Suggestive Identification Claim**

An identification violates a defendant's right to due process when the identification procedure "was so unnecessarily suggestive as to run the risk of irreparable mistaken identification." *Howard v. Bouchard*, 405 F.3d 459, 469 (6th Cir. 2005) (citations omitted). Recognizing that reliability is the "linchpin" in determining the admissibility of identification testimony, "[w]e thus first assess whether the identification was unnecessarily suggestive, then assess whether the identification was nonetheless reliable." *Id.* Importantly, even if the confrontation is suggestive, an identification will be admissible if it is reliable. *Id.* (citations omitted). In determining the reliability of an identification, we consider the totality of the circumstances, including (1) the witness's opportunity to view the defendant at the initial observation, (2) the witness's degree of attention, (3) the accuracy of the witness's prior description of the defendant, (4) the witness's level of certainty at the pretrial identification, and (5) the length of time between the initial observation and the identification. *Id.* at 472 (citing *Manson v. Brathwaite*, 432 U.S. 98, 114 (1977); *Biggers*, 409 U.S. at 199-200).

Petitioner argues on appeal that the showup procedure in which he was identified was impermissibly suggestive. He claims that because he was shown to witnesses while in the back of a police car and because he was presented as the sole suspect, he was the subject of a one-on-one showup. He further contends that because the police had him in custody and were waiting for the witnesses to make an identification, the witnesses did not have time to observe Petitioner and to consider whether he comported with their recollection, as they would have had in a lineup. He also claims that the police "inappropriately played to the witnesses' fears" because as far as

the witnesses knew, Petitioner, who apparently had reason to hide from the police, would be released absent their identification. He thus concludes that "[a]ll these factors combined to create an impermissibly suggestive situation," giving rise to a substantial likelihood of irreparable misrepresentation. He contends that this amounts to a per se violation of his due process rights.

Petitioner next argues that even if the showup was not a per se violation of his due process rights, the identification still failed to satisfy the reliability criteria of *Biggers*. He emphasizes that Ms. Capley (1) was busy cashing checks when the criminal entered the store; (2) was distracted with other tasks, which limited her "opportunity and degree of attention"; (3) described the thief in a "fairly vague" manner; (4) could have had a clouded recollection because Petitioner had been in the store earlier that day; and (5) viewed Petitioner two hours after the crime occurred, which is a "significant" delay. With respect to Ms. Sigler's identification, he notes that she (1) did not actually see the thief take money from the cash register; (2) was on the phone at the time the thief entered the store; and (3) had a limited opportunity to view the thief. Petitioner concludes by arguing that both witnesses had little time to observe him in the car and to reflect on whether he was the same man who robbed the store, and that the fact that he was seated when he was identified prevented the witnesses from observing what he refers to as "significant traits," such as his height, clothing, posture, and mannerisms.

The Tennessee state court's ruling with respect to the identification procedure was neither contrary to nor an unreasonable application of clearly established federal law. Petitioner's first argument is easily dismissed. He asserts that the showup procedure was impermissibly

suggestive for a number of reasons and then apparently argues that the showup amounts to a per se violation of his right to due process. Under the law of this Court, even if an identification procedure was impermissibly suggestive, the identification is still admissible if it is reliable. *Howard*, 405 F.3d at 469, 472. Indeed, conducting a showup is consistent with legitimate law enforcement purposes, such as allowing identification before the suspect has had the opportunity to alter his appearance and permitting the quick release of innocent persons. *See, e.g.*, *United States v. Sleet*, 54 F.3d 303, 309 (7th Cir. 1995); *Johnson v. Dugger*, 817 F.2d 726, 729 (11th Cir. 1987). Thus, Petitioner's first argument fails.

His second argument similarly lacks merit. Even if the identification procedure were impermissibly suggestive, the Tennessee state court did not err in concluding that the identification was reliable according to *Biggers*. With respect to the opportunity to view the criminal at the time of the crime inquiry, the state court found that both Ms. Sigler and Ms. Capley clearly saw Petitioner standing in line and taking the money from the register, *State v. Drew*, No. M2000-01853-CCA-R3-CD, 2001 WL 1028821, at *3 (Tenn. Crim. App. Sept. 7, 2001), and even Petitioner admits that Ms. Capley had the opportunity to see the thief for a few minutes. Petitioner's statements that (1) Ms. Capley was waiting on other customers and was distracted with other tasks and (2) Ms. Sigler did not actually see the thief take the money from the cash drawer and she was on the phone when the thief entered the store, accomplish little to undermine the state court's finding that Ms. Sigler and Ms. Capley had "ample opportunity to view [Petitioner]." *Id.* This is especially true considering that both Ms. Sigler and Ms. Capley described the thief to police as a black male wearing a light colored shirt and dark pants, and Ms.

Sigler described in detail features of the thief's face. *Id*. Furthermore, the Tennessee state court noted that Ms. Sigler saw the money in Petitioner's hand as he was drawing it back from the register, *id.* at *1, and even Petitioner admitted that she saw the thief fleeing with the money in his hand.

With respect to the witness' degree of attention, Petitioner attacks the identification as he does with respect to the opportunity to view the criminal inquiry, and he also contends that the descriptions given were "fairly vague." His arguments are unavailing in light of the state court's finding that each of the eyewitnesses "clearly s[aw] the defendant standing in line and taking money from the cash register." *Drew*, 2001 WL 1028821, at *3. Indeed, it is telling that Petitioner never disputes this finding by the Tennessee court; rather, he merely insinuates that the witnesses might have been distracted prior to the thief taking the money out of the cash register.

The accuracy of the prior description also weighs against Petitioner. His only argument with respect to this inquiry is again an unsupported assertion that the descriptions given were "fairly vague." That contention, however, is belied by the facts that Ms. Capley and Ms. Sigler both described the thief as a black male with a light colored shirt and dark pants and that Ms. Sigler even gave a detailed description of the thief's face, nose, and lips. *Drew*, 2001 WL 1028821, at *3.

The remaining factors of the *Biggers* inquiry also weigh against Petitioner. He contends that because the witnesses observed him while he was seated in a police car, their testimony is not reliable, as they could not observe his height, clothing, posture, and mannerisms. Such speculative claims fail to rebut the fact that, when questioned, each witness was "very certain"

that Petitioner was the thief. *Drew*, 2001 WL 1028821, at *3. Moreover, although Petitioner

contends that the specific facts of the crime tend to make short delays "significant," only two

hours elapsed between the time of the crime and the identification. *Id.* Petitioner cites no

authority in support for his contention that this is a significant delay. The state court's ruling

with respect to the identification procedure thus was neither contrary to nor an unreasonable

application of clearly established federal law.

## C. The Flight Instruction Claim

With respect to this issue, Petitioner claims that, at the time of his trial, the court knew he

was an escapee when he was arrested for theft, and yet it nevertheless authorized a flight

instruction. He argues that this "left him with two intolerable choices": he could take the stand

and explain that he had to flee because he was a prison escapee, thereby "forfeit[ing] his

constitutional right against self-incrimination," or he could allow the jury to infer guilt from his

silence and his failure to explain his flight. Petitioner's Br. 16. In support of his argument,

Petitioner cites cases for the propositions that criminal defendants are guaranteed the right to

remain silent, they will suffer no penalty for such silence, and neither the prosecution nor the

court may comment that such silence is evidence of guilt.

This argument fails. Our inquiry as to whether a flight instruction was properly given

contains no per se exception in the case of a prison escapee, as Petitioner would have us now

proclaim. In *United States v. Smith*, 27 F. App'x 577, 583 (6th Cir. 2001), we held that "[a] jury

may consider flight in its deliberations if it may reasonably draw a four-part chain of inferences

from the evidence: (1) from the defendant's behavior, flight, (2) from the flight, consciousness

- 10 -

of guilt, (3) from consciousness of guilt, consciousness of guilt concerning the crime charged, and (4) from consciousness of guilt concerning the crime charged, actual guilt of the crime charged." Here, even Petitioner does not claim that he ran from the store after stealing the money due to his prison escapee status and not because of the theft. Furthermore, it defies logic that a criminal defendant could avoid a flight instruction simply by virtue of his prison escapee status at the time he commits a crime. Petitioner cites no authority for such a proposition. For these reasons, it cannot be said that the state court adjudication resulted in a decision that was contrary to or an unreasonable application of clearly established federal law. *Williams*, 529 U.S. at 412-13.

## III. CONCLUSION

For the foregoing reasons, we AFFIRM the orders of the district court.